IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BRUCE FREELAND,

                     Plaintiff,                 OPINION AND ORDER

    v.

                                                  11-cv-053-wmc

UNUM LIFE INSURANCE
COMPANY OF AMERICA,

                     Defendant.

---

      In this action, plaintiff Bruce Freeland alleges that defendant Unum Life Insurance Company of America terminated his long-term disability benefits in violation of ERISA (29 U.S.C. §§ 1001, *et seq*.).  Both parties have moved for summary judgment.[1]  Based on the record before it, this court agrees that Unum acted arbitrarily and capriciously in failing to consider evidence that (1) Freeland's job at Luther Hospital was a major cause of his disability and (2) Freeland's return to work would likely trigger a relapse. Accordingly, the court will grant summary judgment to Freeland on his claim for wrongful benefit termination, but will order reinstatement of benefits for only one year because Unum reasonably determined that Freeland's disability was due to a psychological illness.  The court will also grant Freeland's motion for attorney's fees, but

---

[1] Jurisdiction over plaintiff's claim is proper in this court under 28 U.S.C. § 1331 and 29 U.S.C. § 1132(e)(1).  Venue is proper in the Western District of Wisconsin pursuant to 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e)(2).

deny his motion to bar Unum from applying set-offs for SSDI and retirement payments against his benefit award.[2]

## UNDISPUTED FACTS

From the parties' complaint, answer, proposed findings of facts and responses, the court finds the following facts undisputed for the purpose of deciding the present motions.

### A.     The Parties

Plaintiff Bruce Freeland, age 65, was employed as Director of the Cardiac Clinic at Luther Hospital in Eau Claire, Wisconsin for over 30 years, until September 30, 2008. At the time that he stopped working, Freeland suffered from PTSD, depression, anxiety, coronary atherosclerosis, and several other orthopedic and cardiovascular conditions. Incident to his employment, Mr. Freeland received coverage under Luther Hospital's group, long-term disability insurance plan ("the Plan"), which is underwritten, insured and administered by Unum Life Insurance Company of America ("Unum").   After leaving work, Freeland received short term disability benefits for two months, making him eligible for long term disability payments from the Plan beginning December 30, 2008.

---

[2] The court will also deny defendant's motion to strike plaintiff's Reply Memorandum in Support of Cross-Motion for Summary Judgment.  (Dkt. #33.)   The court entered a scheduling order, which allowed for the brief in reply to be filed by July 1, 2011.  (Dkt. #21.)  When the court subsequently indicated that no further scheduling needed (*see* dkt. #25), it did *not* revoke that briefing schedule.  Accordingly, plaintiff's brief in reply (dkt. #32), filed on June 20, was timely.

**B.     The Plan**

The Plan is subject to regulation under the Employee Retirement Income Security

Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*  Among other duties,

Unum serves as the Plan's claim fiduciary with "discretionary authority to make benefit

determinations under the Plan."  Under the terms of Freeland's policy,

> Benefit determinations include determining eligibility for benefits and the amount of any benefits, resolving factual disputes, and interpreting and enforcing the provisions of the Plan. All benefit determinations must be reasonable and based on the terms of the Plan and the facts and circumstances of each claim.

(Affidavit of Denise J. Laverriere ("Laverrierer Aff."), Ex. 1 (dkt. #14) at UA-CL-000145-

000181[3].)

To be found disabled under the Plan, UNUM must find that:

- you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and

- you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

                                    ****

> After 24 months of payments, you are disabled when Unum determines that due to the same sickness or injury, you are unable to perform the duties of any gainful occupation for which you are reasonably fitted by education, training or experience.

The Plan also defines the following, relevant terms:

> LIMITED means what you cannot or are unable to do.

---

[3] The citation shorthand "UA-CL ######" refers to documents in the administrative record of plaintiff's earlier appeal, as marked with Bates stamped page numbers.

MATERIAL AND SUBSTANTIAL DUTIES means duties that:

- are normally required for the performance of your regular occupation; and

- cannot be reasonably omitted or modified.

REGULAR OCCUPATION means the occupation you are routinely performing when your disability begins.

\*\*\*\*

Unum will look at your occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location.

\*\*\*\*

GAINFUL OCCUPATION means an occupation that is or can be expected to provide you with an income within 12 months of your return to work, that exceeds 80% of your indexed monthly earnings, if you are working or 60% of your indexed monthly earnings, if you are not working.

The Plan also contains a "lifetime cumulative maximum benefit period for all disabilities due to mental illness" of 24 months, "even if the disabilities are not continuous; and/or are not related."  "MENTAL ILLNESS" is defined by the Plan as

a psychiatric or psychological condition classified in the Diagnostic and Statistical Manual of Mental Health Disorders (DSM), published by the American Psychiatric Association, most current as of the start of a disability. Such disorders include, but are not limited to, psychotic, emotional or behavioral disorders, or disorders relatable to stress.

In relevant part, the Plan also directs Unum to "subtract from your gross disability payment the following deductible sources of income:"

4

The amount that you, your spouse and your children receive or are entitled to receive as disability payments because of your disability under:

- The United States Social Security Act.

****

The amount that you

- receive as disability payments under your Employer"s retirement plan

- voluntarily elect to receive as retirement payments under your Employer"s retirement plan

- receive as retirement payments when you reach the later of age 62 or normal retirement age, as defined in your Employer"s retirement plan.

(*Id.* at UA-CL 000145 -181.)

Finally, to file a proof of claim under the Plan, a claimant must show:

- the extent of your disability, including restrictions and limitations preventing you from performing your regular occupation; and

- the name and address of any hospital or institution where you received treatment, including all attending physicians.

## C.   Unum's Duties Pursuant to the Regulatory Settlement Agreement of 2004

On November 18, 2004, Unum entered into a Regulatory Settlement Agreement

("RSA") with various state departments of insurance, including Wisconsin's, as a result of

a multi-state lawsuit accusing Unum of the systemic handling of claims in bad faith.  (Pl's

Prop. Finding of Fact, Ex. A (dkt #23) ¶¶ 17-20.)[4]  In the RSA, Unum bound itself to "consider and afford appropriate weight to all diagnoses and impairments, and their combined effect on the whole person, when evaluating medical data in [any] claim file." *Id.*  UNUM also acknowledged that when multiple medical professionals are involved in reviewing a claim, all are responsible for coordinating their opinions and ensuring that each understands how the various opinions fit together for a "coherent view of the claimant's medical condition, capacity, and restrictions/limitations."  *Id.*

The RSA also requires Unum to give

> significant weight to an award of Social Security disability benefits as supporting a finding of disability unless the Companies have compelling evidence that the decision of the Social Security Administration was (i) founded on an error of law or an abuse of discretion; or (ii) inconsistent with the applicable medical evidence; or (iii) inconsistent with the definition of disability contained in the applicable insurance policy.

*Id.*

---

[4] Defendant asserts that the court should disregard the RSA because it is not part of the administrative record.  The court disagrees.  As a matter of fact, the RSA *is* mentioned in the administrative record.   In its appeal letter, plaintiff pointed out defendant's obligations pursuant to the RSA.   (UA-CL-000944-000946.)   More importantly, the purpose of this court's review is to determine whether defendant correctly weighed the facts contained within the administrative record in light of (external) law, of which the RSA is a part.  In a separate argument, plaintiff claims that the Unum's own Benefits Center Claims Manual imposes duties similar to those in the RSA, but does not explain where to find this Manual.

**D.     Freeland's Long Term Disability (LTD) Benefits Claim**

    **1.     Initial Denial**

On November 15, 2008, Freeland made a claim for LTD benefits, indicating that he was unable to perform his job duties due to PTSD and coronary disease "that ha[d] gotten worse due to the stress of [his] job." Freeland submitted an attending physician statement from his psychiatrist, Paul Erickson, M.D., which indicated a primary diagnosis of PTSD and restricted Freeland from work for six months. Freeland also submitted extensive treatment notes and an attending physician statement from his cardiologist, John Rozich, M.D. Rozich noted that Freeland had an ongoing cardiac condition since 2000, including several coronary angiography procedures and stenting related to angina and coronary artery disease, and explained that Freeland was morbidly obese, had severe sleep apnea, dyslipidemia hypertension, and occasional left chest pain. Rozich also noted that despite these diagnoses, Freeland was still "[l]ow risk . . . for ischemic coronary artery disease." Rozich did not impose any work restrictions or limitations based on Freeland's overall cardiovascular condition.

Unum evaluated Freeland's claim for benefits by requesting that a psychiatrist, Dr. Nicholas Kletti, review Freeland's psychiatric records. Kletti found that Freeland's file suggested an ongoing history of PTSD, anxiety, frustration and depression. However, after analyzing the evidence, Dr. Kletti noted that:

> There is little documentation of significant depression, PTSD or other anxiety symptom. There is no documentation of any significant non-occupational impairment. There has been no change to claimant's medication regimen since January 23, 2008."

(UA-CL-000734.)  Dr. Kletti concluded that although Freeland self-reported that he "could barely function," the file documentation did not show any actual work performance impairment.

As a follow-up to his review of Freeland's psychiatric file, Dr. Kletti contacted Freeland's psychiatrist, Dr. Erickson, regarding the nature and extent of Freeland's impairments, restrictions and limitations, and ability to work.  In a response dated April 6, 2009, Dr. Erickson explained that he had been treating Freeland for PTSD and depression since October 2008, and that Freeland reported his continued "struggle with depression and anxiety symptoms," which he indicated "functionally impaired his ability to work."  (UA-CL-000762.)  From this conversation, Kletti concluded that Dr. Erickson "does not appear to certify psychiatric impairment" and "does not provide [restrictions and limitations]."  Kletti also notes that Erickson "does not address the substantive issues outlined in [my] letter of inquiry, particularly the concerns that claimant did not go out of work and has not remained out of work due to psychiatric impairment."

Dr. Kletti then referred Freeland's file to Unum medical consultant Keith A. Caruso, M.D., a psychiatrist and neurologist.  Dr. Caruso concurred with Dr. Kletti's opinion, explaining that Freeland had not received treatment consistent with what one would expect for a person with illness as severe as Freeland self-reported, and opining that Freeland "made the decision to leave work prior to presenting to his providers."  Dr. Caruso concluded that Freeland "has not provided standard, accepted medical evidence to support a psychiatrically impairing condition that would preclude work."  (UA-CL-000779.)

8

Unum sent Freeland a letter dated April 20, 2009, indicating that it was denying his request for benefits, and echoing the reasons provided by Drs. Kletti and Caruso.  In response, Freeland submitted a letter dated May 19, 2009, which disputed many of the assertions in Unum's denial and requested that additional evidence be given consideration.  Freeland also stated that he would have stayed at work if he had a choice, but that his depression, anxiety and cardiac conditions had been affecting his ability to perform his job.   (UA-CL-000819.)   Freeland included several additional pieces of evidence.  First, a copy of a letter Dr. Rozich sent to the Department of Veterans Affairs ("VA") in September 2008, indicating that Freeland could not continue in his current job because of a combination of cardiovascular and psychological conditions.  Second, a March 31, 2009, letter from his supervisor Dennis Pope, a Vice President at Luther Hospital, which described his declining job performance over the past several years.  Third, a VA cardiology report dated March 3, 2009, which noted that Freeland had mild mid-chest air hunger associated with exertional activity.  Fourth, additional VA Medical Clinic treatment notes from March and April 2009, showing Freeland suffered from anxiety and depression that impacted his verbal memory recall.

Unum submitted the additional information to Drs. Kletti and Caruso, requesting that they review the information and determine if it altered their prior conclusions. Neither doctor found that the additional information altered their analysis.  Kletti stated that "cognitive testing does not find significant deficits and there is no documented need for medication adjustment. . . . [p]sychotherapy notes continue to document work

around self-esteem and interpersonal relationships and are not consistent with psychiatrically impairing symptoms or concerns."

Tim Andenmatten, a Unum vocational rehabilitation consultant, then performed a vocational assessment to determine the material and substantial duties of Freeland's occupation as Director of the Heart Clinic. Andenmatten determined that Freeland's position involves primarily administration, direction and coordination tasks; physically the position is sedentary and requires exerting 20 pounds of force occasionally and 10 pounds frequently, with occasional standing, walking, reaching, handling, fingering and hearing, and frequent sitting.

In June 2009, Unum medical consultant Nancy L. Heimonen, M.D., also reviewed Freeland's medical records and Andenmatten's vocational assessment to determine if a physical condition precluded Freeland from working as Director of the Heart Clinic. Dr. Heimonen concluded that "from a purely physical point of view, I see no evidence of a medical condition that would preclude full-time, primarily seated work capacity at this time. It is my impression that this is further supported by his reported activities and exercise tolerance." In correspondence dated June 16, 2009, Dr. Heimonen shared her opinion with Freeland's cardiologist, Dr. Rozich, who agreed with Dr. Heimonen's assessment.

On August 4, 2009, Unum affirmed its initial decision to deny benefits because Freeland's mental health condition and coronary disease did "not rise to the level to preclude work capacity."

### 2.  Successful Appeal of Benefits Denial

In June 2009, Freeland was awarded Social Security Disability Insurance ("SSDI"), retroactive to March 2009.  The SSDI determination found that Freeland had been unable to engage in "substantial gainful activity" as of September 30, 2008.  The primary diagnosis was "anxiety related disorders" and the secondary diagnosis was "lumbosacral DDD" [a spinal disc disorder].

 On December 21, 2009, Freeland appealed Unum's benefits decision.  Enclosed with his appeal was additional information from (1) the Department of Veteran Affairs, which had recently increased Freeland's disability rating, (2) his entire SSDI file, which contained the medical documentation and reviews underlying the recent SSDI disability determination, and (3) another letter from Dr. Rozich.

The VA report found that "[t]he evaluation of post traumatic stress disorder and dysthymic disorder is increased to 50 percent disabling effective May 8, 2007," because of "reduced reliability in your stressful position at work due to panic attacks, increased anxiety, and disturbances of motivation and mood."  However, the VA noted that "a higher 70 percent evaluation is not warranted as the VA examiner opined that your symptoms are not of such severity as to result in deficiencies in most areas, such as work[.]"  The VA found Freeland's coronary heart disease 20 percent disabling based on the presence of a mild ventricular hypertrophy in his January 2008 treatment records, and found his lumbrosacral degenerative disc disease ten percent disabling based on his reports of pain and evidence of mild disc degeneration.  Freeland's request for disability

ratings for his hip and leg were rejected.  Finally, the VA rejected his claim of individual unemployability in any "substantially gainful occupation."

The Social Security documents contained, among other things, a psychological analysis by Dr. B. Ahn.  Dr. Ahn found evidence of "mental impairment related to PTSD and depressive disorder with treatment."  He also found Freeland "moderately limited" in some cognitive areas, and less than moderately limited ("not significantly limited") in other cognitive areas.  Dr. K. Farrell provided a physical analysis, finding that Freeland's lumbosacral disk problems, obesity and nerve damage prevented him from climbing ladders, kneeling and crawling, and allowed him to only occasionally climb stairs, balance, stoop or crouch.  Farrell found that Freeland was able to occasionally lift up to 20 pounds, frequently lift up to 10 pounds, stand and/or walk for at least 2 hours in an 8-hour work day, sit approximately 6 hours in an 8-hour workday and engage in unlimited pushing and/or pulling.  The Social Security Administration awarded monthly SSDI benefits in the amount of $2,127.00 retroactive to March 2009, based on a "combination of . . . psychological and physical impairments [which] substantially limit the ability to . . . complete a normal workday and workweek."  (UA-CL-001048.)

In his letter dated November 24, 2009, Dr. Rozich opined that Freeland's "health conditions (both cardiovascular and psychological) were such that he could no longer perform the essential functions of the Director position."  (UA-CL-000948.)  Dr. Rozich did not reference any new testing or examination in support of this opinion, but did opine that "from a purely cardiac standpoint" Freeland would be able to do an average

12

sedentary job, but would not be able to handle the combination of psychological and cardiac stress imposed by his job as Director of the Luther Heart Clinic.

In January 2010, Unum submitted the appeal file to two medical consultants. Dr. Stuart Anfang, a forensic psychiatrist, reviewed the information to determine whether Freeland's psychological illness supported restrictions and limitations and diminished occupational functional capacity from October 1, 2008 onward. He found that it did through "at least spring 2009" (the most recent behavioral health clinical data on file). Dr. Alfred Parisi -- board certified in internal medicine, cardiovascular disease and echocardiography -- reviewed the physical health data to determine whether Freeland's cardiac condition impaired his functional capacity. He found no indication in the file supporting the contention that Freeland's coronary disease progressed during or after 2008. Dr. Parisi also noted that Freeland's other physical conditions were well-controlled and well-treated and did not interfere with his functioning, including hypertension, hyperlipidemia, sleep apnea, obesity, prostatic hypertrophy and low back pain. Based on these findings, Dr. Parisi found no "evidence for impairment from claimant's cardiovascular disease taken in conjunction with all of his remaining physical medical comorbidities that would preclude functional capacity for light work or a substantive basis for restricting him from same as of 10/1/08."

After receiving these additional opinions, Unum advised Freeland on February 12, 2010, that it was reversing the prior denial of benefits and granting benefits based on his PTSD with associated anxiety/depressive symptoms. Unum explained: "The medical evidence would support impairment at least through the spring of 2009, which is the

13

most recent behavioral health clinical data on file.  The decision is also consistent with the reviews completed by the SSA and the VA."  Unlike the SSA and VA, Unum's determination of disability was based on Freeland's psychiatric illness only, noting that "[i]n regard to Mr. Freeland's physical conditions, the medical evidence does not support restrictions and/or limitations that would preclude him from performing a sedentary or light occupation based on Mr. Freeland's cardiac condition taken in conjunction with his other conditions[.]"

In conjunction with its February 12 award of benefits, Unum advised Freeland that "the [24-month] policy limitation [ ] related to the limitation of benefits due to mental illness is applicable to [your] claim."    On May 19, 2010, Unum sent Freeland correspondence reiterating that his disability was subject to this twenty-four month limitation.  On May 20, 2010, Freeland's counsel contested Unum's determination that the claim was limited to twenty-four months of benefits and requested copies of all medical documentation submitted since the appeal.

When it awarded Freeland benefits in February 2010, Unum also advised him that, pursuant to the Plan's policy, it would be subtracting any retirement payments and Social Security Disability payments from his Plan benefits.  On February 19, 2010, Unum sent Freeland a letter with the calculated benefit amount before these deductions, resulting in a gross monthly disability benefit of $6,029.69.  On April 20, 2010, Unum sent a letter to Luther Hospital seeking additional information regarding any pension/retirement benefits being received by Freeland.  On May 3, 2010, Unum received a response from Luther indicating that Freeland began receiving a defined

14

pension payment of $3,250.53 on April 1, 2009.  Based on this information, Unum applied a retirement/pension monthly offset of $3,250.53 beginning on April 1, 2009, along with an additional SSDI offset of $2,127.00 monthly beginning March 1, 2009. After offsets, this meant Freeland received a net monthly disability benefit of $652.16 beginning April 1, 2009.

**3.        Unum Requests Medical Documentation to Support A Finding of Disability Beyond March 2010.**

On May 19, 2010, Unum requested medical documentation to support ongoing restrictions and limitations beyond March 2010.  On May 22, 2010, Freeland sent Unum additional medical records for the period of April 1, 2009 through April 21, 2010, and later sent records through June 2010.  The additional records noted that Freeland still reported feeling anxious at times, with bouts of poor sleep, and "up and down" emotions.  (*See, e.g.*, UA-CL-001543.)  However, the notes also showed a general trend of improvement in his stress and anxiety.  (*See, e.g.*, UA-CL-001539.)  For example, on December 31, 2009, Freeland's psychiatrist, Dr. Erickson, wrote that Freeland:

> notes he is off wellbutrin and restarted on venlafaxine and doing well, in fact states, "this is the best that I've felt in a while. He rates his mood at 6/10 with 10 being good, denies any thoughts of suicide, anxiety "much better," more motivated, "more ambition," exercising more. He notes he is planning a vacation to Florida during winter, home life is going well.

On June 4, 2010, Unum received an Attending Physician Statement from Dr. Erickson, which indicated that although Freeland was still "being treated for symptoms related to PTSD and depression," his last examination occurred on March 29, 2010, and

15

that the next scheduled examination would be September 30, 2010. Erickson described

Freeland's ongoing treatment program succinctly: "medication and therapy as needed."

On June 9, 2010, a Unum claims representative contacted Freeland to inquire

about his health status. Freeland indicated that he had been seeing Dr. Erickson every 2-

3 months, but reduced his visits to every six months, and that he had not seen Dr. Erbes,

his psychotherapist, since the previous summer. Freeland also indicated that he changed

his medication "a couple of months ago and that seems to be helping a lot." With

respect to his coronary disease, Freeland indicated that his chest "feels good now that he

is not working." Freeland stated that he had been doing "some walking in the mornings,"

"trying to do a little fishing," "mow[ing] the lawn", and "do[ing] some chores around the

house" and that he had not traveled.

Unum provided this additional information to Drs. Kletti and Caruso for review.

Dr. Kletti concluded that:

> [t]he updated file records document significant improvement
> in symptoms, functional abilities and reduction of treatment
> intensity which would be consistent with resolution of
> psychiatric impairment as of December 31, 2009 office visit
> notes with Dr. Erickson. That claimant has not returned to
> work after December 31, 2009 appears to be the result of
> non-clinical factors, e.g., retirement, and not because of any
> ongoing global or pervasive impairment precluding ability to
> work.

(UA-CL-001624). Dr. Caruso observed that,

> [t]he data in the file fails to support [restrictions and
> limitations] beyond 12/31/09 because of a lack of
> documented impairing depressive or PTSD symptoms. Dr.
> Erickson's 12/31/09 [office visit notes] described significant
> improvement, and this was apparently sustained in his
> 3/29/10 [office visit notes]. Therapy has been terminated for

16

> over a year, and medication management is now only every 6
> months.  Both [Freeland] and his psychiatrist report that he
> is doing well.   Mr. Freeland's current treatment regimen
> consists of submaximally dosed antidepressant monotherapy
> with venlafaxine 150 mg qd. His current level of treatment is
> not consistent with that of an impairing psychiatric
> condition.

(UA-CL-001735.)

### 4.    Discontinuation of Benefits

On June 30, 2010, Unum advised Freeland that it was discontinuing payment of

benefits beyond March 2009.  Unum explained that his medical records did not establish

that his conditions rendered him unable to work after March 31, 2009.  Specifically, it

stated:

> Your primary diagnosis by SSDI is anxiety related disorders
> and your secondary diagnosis is lumbrosacral degenerative
> disc disease.   Although these conditions may have been
> disabling at the time of the SSDI decision, the [SSDI]
> decision was completed using medical information from May
> 8, 2007 through April 8, 2009.   We have determined that
> you have not been impaired by these conditions since
> December 31, 2009.  (UA-CL-001724.)

On September 3, 2010, Freeland appealed Unum's discontinuation of benefits

and the determination that his benefits were subject to the twenty-four month limitation

for mental illness pursuant to 29 U.S.C. § 1133 and 29 C.F.R. § 2560.503-1.  (UA-CL-

001781-001789.)  The appeal letter included:  VA medical records from June 2009 to

the time of appeal; a March 12, 2010, cardiology report from Dr. Rozich; and a report

from Dr. Joseph Hebl, who evaluated Freeland at the request of Dr. Rozich.

The cardiology report from Dr. Rozich stated that Freeland remained

compromised in any stressful situation based on Rozich having watched Freeland

17

unsuccessfully deal with work stress, gain excessive weight, have angina and become increasingly dyspneic with activity.   (UA-CL-001773-001774.)   Although Freeland's obesity was improving and the stress related to PTSD and his work environment had partially resolved, Rozich noted that his psychological limitation was "still a significant subacute problem and remains very easy to resurface under the appropriate adverse conditions."   Rozich also noted that Freeland still complained of "mid-chest air hunger" associated with activities of daily living, and pointed out that he had lost significant mobility in his leg.   Rozich concluded that he was very concerned that it would be detrimental if Freeland put himself back into a stressful environment.

Dr. Hebl, an occupational medicine specialist, opined that:

> The patient has numerous medical conditions which, in my opinion, preclude him from returning to gainful employment. These conditions include chronic degenerative arthritis of the entire spine with chronic cervical pain, weakness and loss of range of motion, and chronic low back pain, weakness and loss of range of motion. In addition, the patient suffers with morbid obesity. He also has a sleep disorder, namely sleep apnea. The patient also has unstable angina. . . . In addition, the patient has suffered with post-traumatic stress disorder for about 40 years[.]

(UA-CL-001786.)   Hebl noted the potential risk of exacerbation of Freeland's cardiac condition as a further basis for his inability to work: "In my judgment, it would be improper for him to return to stressful environments as the risk of cardiac complications is simply unacceptable."   Hebl determined that Freeland would be able to sustain only 2-3 hours of sedentary type activity per day, would likely need to take breaks after performing any light chores or activity, and could not return to any role that would raise his stress level.

Dr. Hebl also completed an attending physician statement on August 4, 2010, in which he listed Freeland's diagnoses as coronary atherosclerosis, abnormal respiratory condition, hyperlipidemia, and hypertension.  He commented that Freeland was unable to return to gainful employment because of multiple musculoskeletal, cardiac and mental health conditions, including chronic degenerative disc disease, chronic low back pain, foot drop, unstable angina, and PTSD.   Finally, Dr. Hebl completed an estimated functional abilities form, again finding Freeland limited to sedentary, non-stressful activity for only 2-3 hours per day and "nothing more."  He opined that there would "never" be a change in his functional ability, except that it would continue to deteriorate. (UA-CL-001770-001771.)

Unum submitted Freeland's additional medical records and the reports by Drs. Rozich and Hebl to its Senior Clinical Consultant, Brenda Nunn, R.N., for review on appeal.  Nurse Nunn reviewed the medical records in the claim file, with a particular focus on Dr. Hebl's reports, and provided the following analysis:

> With respect to the whole person analysis, Dr. Hebl and the employee's treatment providers indicate impairing conditions of degenerative arthritis of the cervical, thoracic and lumbar spine, chronic PTSD with no tolerance for even low stress activities, and unstable angina as the result of coronary artery disease. Dr. Hebl even noted the employee's cardiac status would be placed at significant risk if he engaged in even low stress activities. He also noted co-morbid diagnoses of morbid obesity, sleep apnea and the left foot drop.
>
> Degenerative arthritis of the cervical, thoracic and lumbar spine is not supported as an impairment as a whole because there are no cervical or thoracic studies on file. The 8/4/10 examination by Dr. Hebl does document bilateral spasm in the neck and pain with extreme ranges of motion and limited range of motion in the lumbar spine as the employee had 40

19

> degrees of forward flexion and 10 degrees of extension for the cervical or thoracic spine . . . Chronic PTSD is controlled as evidenced by the active life the employee is leading reflected in his travels and reporting he feels "the best" he has felt in a long time. In addition, going more than a year without psychotherapy, no medication changes in more than six months, and reducing psychiatric medication sessions to twice a year would not indicate a level of care to support an impairing psychiatric condition. Coronary artery disease continues to be stable as evidenced by 7/09 nuclear stress testing revealing no ischemia or focal wall motion abnormality with an ejection fraction of 51 percent. In addition, the employee has admitted he has infrequent episodes of angina. The left foot drop is a condition he has had since 1967 and has not precluded him from participating successfully in the workplace. As for the conditions of obstructive sleep apnea with which the employee is compliant with CPAP, hypertension controlled on medication and hyperlipidemia, and morbid obesity, there is no medical data on file to support these conditions, considered separately or collectively, would support a lack of functional capacity.

(UA-CL-002090-002095.)

After Nurse Nunn's evaluation, the file was referred to Dr. Costas Lambrew, also board certified in internal medicine.  Lambrew concluded based on his review that

> there is no evidence that [Freeland's] comorbid medical conditions, when considered in relationship to his PTSD and anxiety, would preclude sustained, full time, light level work, that the perceived, self-reported level of stress that he reports to Dr. Erickson, and that his sustained work from 5/16/76 through 10/1/08, without any acute cardiac event, or angina since 2003 precludes return to work, given its effective treatment.

(UA-CL-002111.)

Following Dr. Lambrew's review, the file was referred to Unum medical consultant Peter Brown, M.D., board certified in psychiatry, for additional review on appeal.  Dr. Brown stated that

> [w]ith regard to the claimant's psychiatric condition, he has
> been stable and has not reported any significant symptoms or
> side effects during the timeframe in question. Consistent with
> this analysis the claimant's level of treatment (moderate dose
> antidepressant with follow-up visits every 6 months) is
> consistent with a stable disorder of, at most, a mild to
> moderate symptoms or impairment.

(UA-CL-002125.)

By letter dated November 4, 2010, Unum affirmed its earlier decision to discontinue long-term disability benefits payments to Freeland as of December 31, 2009. In this letter, Unum reiterated that "the medical evidence did not support conditions that rose to a level of impairment that would preclude Mr. Freeland from performing his regular occupation."  Unum explained that there had been additional review of Freeland's co-morbid conditions, but concluded that "the totality of the medical evidence does not support restrictions and/or limitations for physical or behavioral health conditions either singly or in combination that would preclude sustained work activity in Mr. Freeland's regular occupation."

OPINION

The parties have filed cross-motions for summary judgment.[5]  Defendant argues that it was not arbitrary and capricious in terminating benefits because the medical

---

[5] Plaintiff contends that "summary judgment" is inappropriate in cases that require the court to conduct a review on the administrative record (although this did not stop plaintiff from moving for summary judgment himself).  (Pl.'s Br. (dkt. #22) 5-6.) Summary judgment is indeed inappropriate if material issues of fact are disputed -- as may often be the case when the court is called to make a *de novo* disability determination based on an administrative record -- but the court is satisfied that the disposition of this dispute on summary judgment is appropriate here.  While the record in this case does

documentation did not support restrictions and limitations for psychological illness, coronary disease, or any other physical condition after March 31, 2009.  Plaintiff argues that Unum acted arbitrarily and capriciously in terminating benefits because it:  (a) gave undue weight to the opinions of its own experts; (b) failed to fully consider the co-morbidity of Freeland's various impairments; and (c) failed to give due weight to the disability determinations of the VA and SSDI systems.  Plaintiff argues that Unum also acted arbitrarily and capriciously in applying the two-year psychological illness restriction to its award of benefits.  Finally, Freeland asks the court to use its equitable powers to cancel out the benefit offsets in Unum's policy, both retroactively and for any prospective award.

### A.       Standard of Review

Where an ERISA insurance plan grants the administrator discretion to determine eligibility, this court review of the administrator's decision has both a substantive and procedural component.   Substantially, the decision must meet the arbitrary and capricious standard.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010).  While this standard of review is obviously highly deferential, the Seventh Circuit has cautioned that it does

---

contain conflicting assertions of fact about Freeland's medical condition, the purposes of the task at hand -- review to see if Unum abused its discretion -- is basically a legal, not a factual inquiry, and none of the remaining factual disputes are material.

not make the court a "rubber stamp."[6] *Holmstrom*, 615 F.3d at 766. "For ERISA purposes, the arbitrary and capricious standard is synonymous with abuse of discretion." *Id.* at 767 n.7 (internal citation, quotation marks and alterations omitted).

ERISA requires that "the administrator [] weigh the evidence for and against [the denial of benefits], and within reasonable limits, the reasons for rejecting evidence must be articulated if there is to be meaningful appellate review." *Halpin v. W.W. Grainger*, 962 F.2d 685, 695 (7th Cir. 1992) (internal quotation omitted). The court will uphold an administrator's decision "if (1) it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, (2) the decision is based on a reasonable explanation of relevant plan documents, or (3) the administrator has based its decision on a consideration of the relevant factors that encompass important aspects of the problem." *Militello v. Cent. States, Se. & Sw. Areas Pension Fund*, 360 F.3d 681, 686 (7th Cir. 2004) (internal quotation marks and citations omitted).

The court is also mindful that Unum serves a dual function in having "both the discretionary authority to determine eligibility for benefits and the obligation to pay

---

[6] In some cases, the Seventh Circuit has stated that the decision must be "downright unreasonable" before reversal would be appropriate. In *Holmstrom*, the court recently clarified that phrase, explaining that the standard of review:

> should not be understood as requiring a plaintiff to show that only a person who had lost complete touch with reality would have denied benefits. Rather, the phrase is merely a shorthand expression for a vast body of law applying the arbitrary-and-capricious standard in ways that include focus on procedural regularity, substantive merit, and faithful execution of fiduciary goals.

615 F.3d at 766 n.5.

23

benefits when due." *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009) (citing *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008)).  This "conflict of interest" does not alter the standard of review -- the abuse of discretion standard still applies -- but is "weighed as a factor in determining whether there is an abuse of discretion."  *Glenn*, 554 U.S. at 115 (citing *Firestone*, 489 U.S. at 115) (quotation marks omitted).[7]

In reviewing the termination of benefits under ERISA, there are also two core procedural requirements that must be met by the administrator's decision:  (1) "that specific reasons for denial be communicated to the claimant"; and (2) "that the claimant be afforded an opportunity for a 'full and fair review' by the administrator."  *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 775 (7th Cir. 2003) (quoting *Halpin*, 962 F.2d at 688-89); *see also* 29 U.S.C. § 1133.  Substantial compliance with these two requirements is sufficient to satisfy ERISA.  *Hackett*, 315 F.3d at 775; *Halpin*, 962 F.2d at 690.

### B.    Unum's Decision to Award Freeland LTD Benefits for Psychological Illness Only

Freeland's LTD insurance policy states that "[t]he lifetime cumulative maximum benefit period for all disabilities *due to mental illness* is 24 months."  (UA-CL-000165 (emphasis added).)  Freeland now disputes whether this two-year cap on benefits applies to him.

---

[7]    Recently, the Seventh Circuit has described this factor as a "key consideration." *Holmstrom*, 615 F.3d at 766.

When it found for Freeland on appeal and decided to award disability benefits, Unum's analysis was apparently based on two separate opinions from its medical experts. Stuart Anfang, a forensic psychiatrist, reviewed Freeland's file to determine the extent of his disability based on his psychological condition.  (UA-CL-001362.)  Dr. Anfang determined that the data "reasonably substantiates claimed psychiatric [restrictions and limitations] (including cognitive difficulties)."   Concurrently, Alfred Parisi, a board certified specialist in internal medicine, cardiovascular disease and echocardiography, reviewed Freeland's file to assess the extent of his disability based on his cardiac condition and other physical ailments.  (UA-CL-001353.)  Parisi stated that he did "not find evidence for impairment from claimant's cardiovascular disease taken in conjunction with all of his remaining physical medical comorbidities that would preclude functional capacity for light work."  (UA-CL-001356.)

None of Unum's experts appeared to consider Freeland's physical and psychological co-morbidities *together* -- Dr. Parisi and other medical experts reviewed his physical condition and Dr. Anfang and other psychological experts separately reviewed his psychological condition.  This violated the Regulatory Settlement Agreement to which Unum is bound.   Specifically, the RSA requires Unum to "consider and afford appropriate weight to all diagnoses and impairments, and their combined effect on the whole person, when evaluating medical data in the claim file." (Pl.'s Proposed Findings of Fact, Ex. A (dkt. #23).)   Under the RSA, Unum is also bound to ensure that when multiple medical professionals are involved in reviewing a claim, all are responsible for coordinating their opinions and understanding how the various opinions fit together for a

"coherent view of the claimant's medical condition, capacity, and restrictions/limitations." *Id.*

On this record, there appears a distinct possibility that Unum might have found a disability that was contributed to by *both* psychological and physical factors if all of Freeland's co-morbidities had been analyzed together. Unfortunately for Freeland, this mistake also appears to have been harmless -- whether Unum defined the disability as purely psychological, or part-physical and part-psychological, it would have been at least reasonable in labeling it a disability "due to mental illness" since there is overwhelming evidence supporting Unum's determination that Freeland was not rendered incapable of work but for his psychological illness. Indeed, the plain language of the phrase "disabilit[y] due to mental illness" describes a condition that rises to the level of a disability because of the psychological illness.

Here, Dr. Parisi reasonably found that plaintiff's physical condition alone was insufficient to constitute a disability. Dr. Rozich, plaintiff's own cardiac doctor, also stated that "from a purely cardiac standpoint," Freeland would be fine in his mostly sedentary job. The VA similarly found that Freeland's coronary heart disease was only 20 percent disabling and his back pain only 10 percent disabling. Finally, the Social Security Administration found that he was able to lift up to 10 pounds frequently; stand and/or walk for at least 2 hours in an 8-hour work day; sit approximately 6 hours in an 8-hour workday; and engage in unlimited pushing and/or pulling.[8]

---

[8] There is almost no evidence to suggest that plaintiff's physical condition has changed since these analyses were performed. The only doctor to suggest that plaintiff's physical condition is now *independently* sufficient to render him disabled is plaintiff's chosen

Unum's determination that Freeland suffered from a "disability due to mental illness" also finds some support in a case considered by the Second Circuit.  In *Sheehan v. Metropolitan Life Ins. Co.*, 368 F. Supp. 2d 228 (S.D.N.Y. 2005), the policy language was admittedly even stronger, since it denied monthly benefits if the disability "in any way results from, or is caused or contributed to by a mental or nervous disorder."  *Id.* at 234-35.  Still, the basic issue was the same and the Second Circuit concluded that "where comorbidity exists between coronary artery disease and [] neurosis, entitlement to disability payments under the Plan exists only if the cardiac condition by itself would constitute a total disability."  *Id.* at 264 (internal quotation marks omitted).

### C.    Unum's Decision to Terminate Freeland's LTD Benefits

In its letter terminating plaintiff's benefits, defendant asserted that the updated medical documents plaintiff submitted showed that his psychological condition had improved and that he had been able to work since December 31, 2009.  In making this determination, defendant relied upon office visit notes by plaintiff's psychiatrist, Dr. Erickson, who noted that plaintiff had changed medication, was often feeling better, and

---

expert, Dr. Hebl, whose a cardiac and orthopedic restrictions are significantly greater than anything Dr. Rozich, the SSA or the VA have ever supported – and were made at a time when plaintiff admitted that his "chest felt better" than before.  Dr. Hebl also did not purport to make his findings based on new medical tests, but merely reinterpreted plaintiff's file with the aid of an in-person patient visit.  Moreover, Dr. Hebl did a poor job of explaining how plaintiff's diagnosed conditions translate into functional disability, particularly in light of the fact that he appeared to be relying primarily upon plaintiff's own self-assessment during the one-time office visit.  (UA-CL-001786-001789.)    Dr. Hebl's assertions of extreme physical inability are also contradicted by Dr. Rozich's contemporaneous letter, which noted that plaintiff was "able to exercise somewhat" and that his "angina [had] decreased" over time.  Given all this, it was not unreasonable for defendants to discount Hebl's opinion.

had reduced the frequency of his visits.  (*E.g.* UA-CL-001539.)   Defendant also relied upon plaintiff's own self reporting that his chest pain had decreased since he stopped working and that he had been doing "some walking in the mornings," "trying to do a little fishing," "mow[ing] the lawn", and "do[ing] some chores around the house" and that he had not traveled.  (UA-CL001601-001602.)

The foundation for Unum's initial decision to terminate benefits was the opinion of their medical experts, Drs. Kletti and Caruso, who read the updated medical information and made a determination about plaintiff's psychological health.   Kletti opined that "[t]he updated file records document significant improvement in symptoms, functional abilities and reduction of treatment intensity which would be consistent with resolution of psychiatric impairment as of December 31, 2009, office visit notes with Dr. Erickson."  (UA-CL-001624.)   When Freeland appealed, Unum also considered the opinions of Brenda Nunn, R.N., Costas Lambrew, M.D., and Peter Brown M.D., who reviewed Freeland's full file, including the most recent notes from the VA, a letter from Dr. Rozich, and an opinion letter from Dr. Joseph Hebl.  Nunn, Lambrew and Brown characterized Dr. Rozich's letter as supporting Freeland's return to an average sedentary occupation, but disagreed with his determination that Freeland could not return to his job as Director of the Heart Clinic.  They also sharply attacked Dr. Hebl's more expansive work restrictions, finding them conclusory and unsupported by reference to any new findings.

Plaintiff attacks defendant's analysis on appeal as both procedurally and substantively deficient.  With respect to the procedural deficiency, Freeland claims that

he did not receive a full and fair review because Unum's experts failed to consider the co-morbidity of all of his illnesses.  The court rejects this argument.  While Drs. Kletti and Caruso failed to consider all co-morbidities in their initial analysis of his psychological record, Dr. Lambrew, in particular, explicitly considered the co-morbidities of all illnesses upon appeal, especially the impact of mental illness upon cardiac function.  (UA-CL-002106-002111.)

With respect to substantive deficiency, Freeland claims that Unum's experts were arbitrary and capricious in their interpretation of the record, as well as swayed by defendant's conflicting interests.  The court does not need to reach all of plaintiff's arguments on this point, because it finds that Unum acted arbitrarily and capriciously in failing to account for the fact that the stress associated with Freeland's former job was a major cause of his initial psychological disability, and that a return to that stress was very likely to cause a relapse of his psychological impairment.[9]  Plaintiff explicitly made this argument in his appeal letter.  (UA-CL-001784 ("[T]he reason for the improvement is due to his absence from the stress of surroundings of his occupation").)

If Freeland's medical assessments and improvement show anything, it is that his work as Director of the Luther Heart Clinic was a major, if not the single most significant, source of stress in his life, and an increasingly potent source of stress at that.

[9] In fairness, Unum's expert Dr. Costas Lambrew touched upon this issue by considering whether Freeland returning to the stress of his job would exacerbate his heart ailments. Dr. Lambrew also noted that Freeland had been able to handle the psychological stress of work until 2008 and, during that year, also suffered two family crises, which exacerbated his stress.  However, none of the experts directly considered the possibility that returning to work would cause a relapse of his psychological illness, or the fact that, on a daily basis, Freeland's overwhelming stress levels in 2008 appeared to be *primarily* due to his increasing inability to handle the strain of his job.

For example, Freeland's initial claim for long term disability benefits attributed his increased anxiety to "the stress of [his] job." (UA-CL-000066.)  In their evaluations, Dr. Rozich and the VA both commented specifically on the extraordinary amount of stress the Director position put on plaintiff, compared to a more typical sedentary job. (UA-CL-000948-949; UA-CL-001004.)   Freeland's supervisor noted that Freeland's "job performance has been slowly declining for several years. . . . [and] his ability to stay focused on his tasks has declined.  His job has become much more stressful during the past two years, and he has not been able to stay abreast of his assignments." (UA-CL-000823.)  While Unum has challenged Freeland's medical claims at virtually every turn, even it does not challenge the notion that his job at Luther Hospital was a major source of stress, as well as a significant contributing factor to his illness.

Since Unum had already determined that Freeland's psychological illness was disabling in 2008, it was inappropriate to require him to return to the same job simply because his symptoms receded after he left work.  To a large extent, the fact that Freeland got better upon leaving work should have *confirmed* the accuracy of Unum's original determination, work as a major contributor to his psychological illness.

This case is somewhat similar to *Evans v. Unumprovident Corp.*, 434 F.3d 866 (6th Cir. 2006).  In *Evans*, a claimant applied for benefits due to a disability caused by her frequent seizures.  Her treating physician opined that the stress associated with her job duties was responsible for the severity and frequency of the episodes.  *See id.* at 870. While on medical leave, the claimant saw an improvement in her condition. Her treating physician determined that it would be in the claimant's best interest not to return to

work. The insurer nevertheless discounted the impact of work-related stress as merely a "prophylactic" factor that should be accorded minimal weight in its determination of disability. The Sixth Circuit found that decision arbitrary and capricious. *Id.* at 879. The major difference between *Evans* and this case is that rather than discounting the possible impact of work-related stress on a relapse of plaintiff's PTSD and anxiety, here defendant did not even address the issue.

For the purposes of an initial determination of disability, and for the first 24 months after awarding benefits (which is the only relevant period here), the Plan policy defines disability with reference to the claimant's "occupation as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location." (UA-CL-000181.) There is nothing in the record to suggest that the position of Director of Luther Hospital Cardiac Clinic is more or less stressful a workplace than a similar center at an average hospital. From the record before the court, it appears quite likely (although not certain) that if, after a period of rest, Freeland had started working again as director of *any* cardiac clinic, the same stress-induced disability would have rapidly reappeared, preventing him from performing his job duties. Given the likelihood of relapse, Unum acted arbitrarily and capriciously in summarily finding Freeland could return to his position at Luther Hospital or a similar one without experiencing a spike in stress levels, return to his psychiatrist, and the need to re-apply for disability.

This is not to say that Unum is stuck paying for most (or even a significant majority of) people who become disabled as a result of a workplace injury and refuse to

31

return to work.  First, there is the 24-month limit in the policy itself, after which the claimant faces the burden of showing that he is incapable of *any* "gainful occupation for which [he is] reasonably fitted by education, training or experience," which is a much higher hurdle to clear.  Second, if there is a reasonable basis to determine that the disability is temporary in nature and will not be re-aggravated by returning to work, Unum may, of course, deny benefits once symptoms recede.  But Unum must properly evaluate that possibility and make an affirmative determination.  Unum certainly may not ignore, as it did here, substantial evidence to the contrary.

### D.    Remedy

#### 1.    Reinstatement Of Benefits

Having found a violation of ERISA, this court is directed by the Seventh Circuit to determine the appropriate remedy by focusing on the "claimant's benefit status" before the wrongful denial.  *Holmstrom*, 615 F.3d at 778 (citing *Schneider v. Sentry Group Long Term Disability Plan*, 422 F.3d 621, 629 (7th Cir. 2005)).  The goal is to "restor[e] the *status quo* prior to the defective proceedings."  *Schneider*, 422 F.3d at 629; *see also Hackett*, 315 F.3d at 776.  In cases involving wrongfully terminated benefits, "the *status quo* prior to the defective procedure was the continuation of benefits," making "a reinstatement of benefits" the proper remedy.  *Hackett*, 315 F.3d at 776.

Unum originally granted LTD benefits to Freeland for the period from December 30, 2008, to December 29, 2010, and ended Freeland's benefits after one year.  In order to return Freeland to the *status quo* before this termination of benefits, the court will

reinstate Freeland's benefits through December 29, 2010.   Unum must also pay prejudgment interest.   29 U.S.C. § 1132(a)(3)(B); *Fritcher v. Health Care Service Corp.*, 301 F.3d 811, 819-20 (7th Cir. 2002).

Unum cites *Majeski v. Metro Life Ins. Co.*, 590 F.3d 478 (7th Cir. 2009), and *Tate v. Long Term Disability Plan for Salaried Employees of Champion Int'l Corp.*, 545 F.3d 555, 562-63 (7th Cir. 2008), for the proposition that remand to determine eligibility for the second year of benefits, rather than reinstatement, is the appropriate remedy.   Those cases are distinguishable, however, in that the successful plaintiffs in both cases could not show they had been entitled to benefits at the time of the defendant's decision, so there was technically no "termination" of benefits.   Here, defendant affirmatively terminated plaintiff's benefits arbitrarily and capriciously, making a return to the *status quo* the reinstatement of benefits.

### 2.       Benefit Offsets

Plaintiff argues that the court should use its equitable powers to cancel out the benefit offsets in Unum's policy, both retroactively and for any prospective award.   29 U.S.C. § 1132(a)(3)(b).  In this case, such a cancellation would apply to the benefits paid out (or due to be paid out) for the two-year period between December 30, 2008 and December 29, 2010.  The court declines to do so.

Plaintiff argues first that it is inequitable for defendant to deduct SSDI payments from its benefit award while simultaneously disregarding the weight of SSDI's disability determination.  Since the court is now reinstating benefits for Freeland on other grounds,

Unum receives no advantage from allegedly ignoring the SSDI determination, and that argument appears moot.  Freeland also argues that Unum should not be able to deduct his retirement pension from his disability benefits because it was Unum's unreasonable initial denial of benefits that forced him to apply for early retirement.  Without getting into the equitable merits of that claim, the court notes that Freeland has not supported his assertion that he was financially "forced" to take early retirement with an appropriate factual submission or affidavit and, therefore, declines to take up the issue.

### 2.     Attorneys' Fees

The Seventh Circuit has recognized two tests for analyzing whether attorneys' fees should be awarded a successful plaintiff under 29 U.S.C. § 1132(g)(1).  *Hardt v. Reliance Standard Life Ins. Co.*, 130 S. Ct. 2149, 2157–58 (2010), under ERISA.  The first test involves five-factors:  1) the degree of the offending party's culpability or bad faith; 2) the ability of the offending party to satisfy personally an award of attorneys' fees; 3) whether or not an award of attorneys' fees against the offending party would deter other persons acting under similar circumstances; 4) the amount of benefit conferred on members of the pension plan as a whole; and 5) the relative merits of the parties' positions. *Filipowicz v. Am. Stores Benefit Plans Comm.*, 56 F.3d 807, 816 (7th Cir. 1995).  The second test looks to whether or not the losing party's position was "substantially justified." *Bittner v. Sadoff & Rudoy Indus.*, 728 F.2d 820, 830 (7th Cir.1984).  This court will apply the first test because it more accurately articulates the various equitable factors appropriate to

34

consider in determining whether attorney fees are appropriate, although the result would be the same under the second test as well for much the same reasons.[10]

The second and third factors cut very much in favor of granting fees, since Unum (like many ERISA defendants) is a large and wealthy insurance company with economic incentives to deny legitimate claims systematically, and has a history of doing just that. The fifth factor is neutral here, since the court has found in favor of both parties on significant issues in this case.  As for the first factor, the court is struck by the fact that at several points in the claims process Unum did not even consider Freeland's co-morbidities, despite entering into a Regulatory Settlement Agreement that explicitly required it to do so.  This, combined with the fact that Unum made only a half-hearted attempt to oppose a fee award in their response to Freeland's proposed findings of fact or even attempt to rebut Freeland's request for attorneys' fees in their opposition brief, tips the scales in plaintiff's favor.

The court intends to enter one final judgment that includes the re-instated benefits, attorneys' fees, and prejudgment interest, and requests input from the parties as set forth in the order below.

ORDER

IT IS ORDERED that:

---

[10] The question has been articulated a third way as well: "was the losing party's position substantially justified and taken in good faith, or was that party simply out to harass its opponent?"  *Quinn v. Blue Cross & Blue Shield Ass'n,* 161 F.3d 472, 478 (7th Cir. 1998). However, the court agrees with *Orth v. Wisconsin State Employees Union*, 2007 WL 2042252 (E.D. Wis. July 11, 2007), that this test applies poorly in some situations, including this one.

1) Defendant Unum Life Insurance Company of America's motion to strike plaintiff Reply Memorandum in Support of Cross-Motion for Summary Judgment (dkt. #33) is DENIED.

2) plaintiff Bruce Freeland's motion for summary judgment (dkt. #21) is GRANTED IN PART and DENIED IN PART as set forth in the opinion above;

3) defendant Unum Life Insurance Company of America's motion for summary judgment (dkt. #11) is GRANTED IN PART and DENIED IN PART as set forth in the opinion above;

4) defendant is directed to submit a calculation of the benefits owed to plaintiff for the period from December 31, 2009, to December 29, 2010 along with prejudgment interest on the delayed benefits by Wednesday, August 29, 2013;

5) plaintiff is directed to submit a claim for his reasonable attorney fees by Wednesday, August 29, 2013; and

6) each side may file a response no later than Wednesday, September 11, 2013.

Entered this 16th day of August, 2013.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

36